## UNITED STATES v. NICKLE.
### No. 9391.

Circuit Court of Appeals, Eighth Circuit.

Aug. 1, 1932.

William L. Vandeventer, U. S. Atty., and Claude E. Curtis, Asst. U. S. Atty., both of Kansas City, Mo., William Wolff Smith, Sp. Counsel, Veterans' Administration, and Bayless L. Guffy, Atty., Veterans' Administration, both of Washington, D. C., and V. E. Willis, Atty., Veterans' Administration, of Kansas City, Mo., for appellant.

L. W. Eubanks, of Monett, Mo., for appellee.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

SANBORN, Circuit Judge.

Earl E. Nickle, plaintiff in the court below, was a soldier in the United States Army from May 29, 1918, to June 13, 1919. There was issued to him a policy of war risk insurance. Premiums were deducted from his pay while he was in the service. He paid no premiums after his discharge. Unless he died or became totally and permanently disabled prior to August 1, 1919, his policy lapsed on that date. He subsequently claimed the benefits of the policy, on the ground that, prior to its lapse for nonpayment of premiums, it had matured because he was then and ever since has been totally and permanently disabled from heart disease and tuberculosis. His claim was disallowed, and he brought this suit. The government filed a general denial, but it was stipulated upon the trial that he was in the service between the dates mentioned, had a $10,000 policy of war risk insurance, premiums on which were paid only to July 1, 1919, and that a disagreement existed between him and the Veterans' Bureau. The trial resulted in a verdict for the plaintiff, and the government has appealed from the judgment entered thereon. Two errors are assigned, both of which relate to the admission of evidence.

Dr. Francis B. Camp, a physician, was called as an expert by the plaintiff. The doctor, upon direct examination, stated that he first met the plaintiff on November 8, 1930, when he made an examination of him, "which consisted of the history, complete physical examination, X-ray findings, laboratory findings, electrocardiographic studies, fluoroscopic examination"; and then said: "The history or the story that we get from our patients, asking questions of them, first the information that they give us, the story that we get, we put down and from that, his symptoms were, as I think you have heard before, shortness of breath, spitting of blood, cough, weakness, which all followed what was apparently—" At this point counsel for the government interposed the following objection: "If the Court please, we object to this doctor telling what history he obtained from this man in view of the fact he examined him only for the purpose of testifying in this case." The court overruled the objection, and counsel excepted. The doctor was told to proceed, and then said: "Shortness of breath, rapid heart action, what we speak of as palpitation, that is, heart action which you can notice, loss of weight, the history of an operation, and fatigue on the slightest exertion, orthopnoea which is a term that describes sitting up at night to (breath), which had been progressive since 1918. Then came the history that was purely from asking him questions, in which I found or he stated that he had night sweats,

breaking out as a rule with cold sweats, restlessness, irritability and depression, but I would say no other special symptoms, only fair appetite. His family history and so forth, was unimportant. Then came the physical examination." The doctor then proceeded to recite the physical findings. He was asked what his diagnosis was, and gave it as "an endocarditis, * * * classified as a mitral stenosis." We quote the following material portions of the record:

"Q. (By Mr. Eubanks): I will put the question this way; what, in your opinion, basing your opinion upon these facts, shortness of breath, irregular heart beat, easy exhaustion upon the slightest exertion, paleness of color, night sweats, and all those symptoms what would be your opinion as to what was wrong? A. I would say from the findings—

"Mr. Willis (Interrupting): Just a minute. When is this, now? When the doctor examined him.

"Mr. Eubanks: I am asking a hypothetical question, with those symptoms, asking him to say what he thinks the disease would be.

"Mr. Willis: We object to the hypothetical question.

"The Court: Upon what grounds?

"Mr. Willis: For the reason it does not state all the facts in the evidence.

"The Court: What facts does it omit, Mr. Willis?

"Mr. Willis: Well, if the Court please, it omits the work in the oil fields, omits the vocational training period, it omits practically everything except the complaints that he gave to this doctor.

"Mr. Eubanks: I beg to remind the Court that it enumerates all of the symptoms that have been gone over and enumerated in evidence here from the first witness on down.

"The Court: If any symptoms of disability or disease have been omitted, I do not recall it, but if they have been, you may remind us of it, Mr. Willis; then I will pass upon your objection.

"Mr. Eubanks: I don't recall any symptoms that I left out.

"The Court: Due to failure of counsel to recall any symptoms described in the evidence not included in this question, and because the court recalls none, the objection is overruled.

"Mr. Willis: Exception.

"A. The symptoms that you have described to me, those are the symptoms of tu-berculosis and also the symptoms of mitral stenosis. That was one thing I heard in the testimony—it was admitted I believe that he did have an irregular heart, I did not find an irregular heart, but that (occurring) in one with known stenosis, indicates irregular fibrillation, which is the most serious of all complications of mitral stenosis. Based upon my findings and diagnosis and knowledge of him I would say that he is totally and permanently disabled. The mitral stenosis is permanent.

"Mr. Willis: Now? A. Yes, now."

The government assigns as error the ruling of the court on its objection interposed to the doctor's testifying to the history given him by the plaintiff, and also the ruling on its objection to the hypothetical question.

■ There was no error in the failure of the court to sustain the objection to the hypothetical question. The doctor was asked for his opinion as to "what was wrong," based upon certain symptoms described in the evidence. The court gave counsel for the government every opportunity to point out what was wrong with the question, but counsel failed to do that, other than to say that it left out certain facts as to past activities of the plaintiff, which were not symptoms of disease and were not necessary as a foundation for an opinion as to "what was wrong." Furthermore, the answer which the doctor gave was not responsive to the question asked. No request was made by the government to strike it out, but instead counsel proceeded to make it clear that the doctor's answer related to the plaintiff's present condition. We do not say that the question was a proper hypothetical question, but the government's objection directed the court's attention to no defect in it.

■ The doctor, however, should not have been permitted to testify as to the history given him by the plaintiff. It appeared from his testimony, on cross-examination, that he had examined the plaintiff solely for the purpose of testifying.

In Delaware, L. & W. R. Co. v. Roalefs (C. C. A.) 70 F. 21, 22, it was said: "The declarations of a patient to his physician respecting his condition and symptoms at the time of seeking medical aid, are admissible as evidence in his behalf, under a well-settled exception to the rule excluding 'hearsay.' (They do not belong to the class of declarations and expressions admissible as res gestæ, and should not be, as they sometimes are, confounded with them.) The exception original-

ly rested on the ground first, that as the common law forbade parties testifying, the facts involved could not be proved in any other way, and second, that the patient's interest in the physician's opinion precluded danger of falsehood. The modern practice of admitting parties as witnesses has removed the first of these grounds; but this is not considered a sufficient reason for excluding the testimony. Railroad Co. v. Urlin, 158 U. S. 271 (15 S. Ct. 840 [39 L. Ed. 977]). To render it admissible, however, the plaintiff must establish the fact on which the exception rests—that is that the declarations were made when seeking medical aid. Here this fact is not proved. It appears simply that the plaintiff called on the doctor a year after the accident, when his condition had much improved, made the declarations, and requested an opinion based upon them and a physical examination. We think the inference is irresistible that he did not call to consult the doctor with a view to medical aid; but to employ and qualify him as an expert, to assist in maintaining the pending suit." See, also, Union Pac. R. Co. v. McMican (C. C. A.) 194 F. 393; Lee v. Kansas City Southern Ry. Co. (D. C.) 206 F. 765; Kansas City Southern Ry. Co. v. Clinton (C. C. A.) 224 F. 896, 897; Grand Trunk Pac. Ry. Co. v. Tollard (C. C. A.) 286 F. 676; Payne v. Daugherty (C. C. A.) 283 F. 353; Hardy-Burlingham Mining Co. v. Baker (C. C. A.) 10 F.(2d) 277.

The plaintiff contends that, since at the time the question was asked it did not yet appear that the history was not obtained for the purpose of treatment, the court did not err in overruling the objection. But the evidence was purely hearsay and should have been excluded unless it had been made to appear, before the question was asked, that the plaintiff had consulted the doctor for the purpose of treatment, and that the history was such as it was necessary and proper for the doctor to procure for the purpose of diagnosing the plaintiff's condition and giving him treatment. It may fairly be assumed that one who is ill or injured will, for the purpose of enabling his physician to treat him, truthfully state such facts relative to his case as it is necessary and desirable for the physician to know, because, under such circumstances, self-interest and ordinary common sense will prompt men to tell the truth. There is, however, no such inducement when one goes to a physician for the purpose of qualifying him to testify in a lawsuit. The purpose then is, not to enable the doctor to effect a cure, but to qualify him as a favorable witness. Therefore, in the absence of evidence that the doctor had obtained the history for the purpose of treatment, the objection of the government should have been sustained.

It is, however, claimed by the plaintiff that, even if it was error to overrule the objection, it was error without prejudice, because other witnesses had testified to substantially these same symptoms. The doctor injected into this case symptoms not referred to by other witnesses, namely, "orthopnoea, which is a term that describes sitting up at night to (breath), which had been progressive since 1918"; and, also, "night sweats, breaking out as a rule with cold sweats." In so far as his testimony covered symptoms referred to by the plaintiff or other witnesses, it served to emphasize such symptoms, and with respect to some of the symptoms—night sweats, restlessness, irritability, and depression—it will be noted that the doctor uses the words, "I found or he stated," and it would not be a simple matter for a jury to determine from his testimony whether his examination verified the history given him by the plaintiff or whether his diagnosis was based upon what the plaintiff told him added to what he discovered objectively. Any one familiar with the trial of cases knows that the history of a patient, testified to by a physician, is frequently much more impressive than the same history given on the stand by the plaintiff himself. Such an error was deemed sufficient to justify a reversal by this court in Grand Trunk Pac. Ry. Co. v. Tollard, supra.

Assuming that the record before us correctly reflects the evidence upon which the verdict was based, it seems just as probable that the testimony of Dr. Camp, which was erroneously admitted, was responsible for the result of the trial as that it was due to the testimony of other witnesses.

While we are concerned with the evidence not objected to only in so far as it has a bearing upon the question of prejudice, there is no impropriety in calling attention to the fact that there seems to be very little, if any, competent evidence in the record before us to establish total and permanent disability existing prior to August 1, 1919.

The judgment is reversed and the case remanded for further proceedings.